# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN FANTINO and DEBBIE FANTINO, CO-ADMINISTRATORS OF THE ESTATE OF ELIZABETH L. FANTINO, | CIVIL ACTION NO: 2:21-cv-0910-WSH |
| Plaintiffs, | Electronically Filed |
| vs. | |
| COUNTY OF WESTMORELAND; WARDEN JOHN R. WALTON; CORRECTIONAL OFFICER LIEUTENANT RICHARD SIKORA; CORRECTIONAL OFFICER KARLEIGH PALEK; CORRECTIONAL OFFICER CHEYENNE FISHER; WEXFORD HEALTH SOURCES, INC.; DR. THOMAS LEHMAN; CNA AUBREY KISTNER; and JANE ROE(S) 1-3, A FICTITIOUS NAME INTENDED TO REPRESENT THE EMPLOYEE(S) RESPONSIBLE FOR CONDUCTING INMATE MEDICAL SCREENINGS/ EVALUATIONS AND PROVIDING MEDICAL CARE. | **JURY TRIAL DEMANDED** |
| Defendants. | |

## FIRST AMENDED COMPLAINT

AND NOW, come the Plaintiffs, JOHN FANTINO and DEBBIE FANTINO, CO-ADMINISTRATORS OF THE ESTATE OF ELIZABETH L. FANTINO, by and through their attorneys, Douglas J. Olcott Esquire and the law firm of Edgar Snyder & Associates, LLC, and file the following Complaint, respectfully averring as follows:

# I. PRELIMINARY STATEMENT

1.     Defendant, Westmoreland County, as the Administrator of the Westmoreland County Prison ("WCP"), and the defendant medical and correctional staff who worked at WCP, were aware that large numbers of inmates admitted to the facility suffer from opioid drug addiction, including heroin, and suffer from detoxification at the time of their admission.  They were aware that detoxification can lead to serious illnesses and, without treatment, death.  They were aware that drug cravings are present in most, if not all individuals, who suffer from opioid abuse disorders and that management of opioid withdrawal reduces cravings.

2.     Despite this awareness, when Elizabeth Fantino ("ELIZABETH"), was transferred to WCP, from Butler County Prison ("BCP") where she had been receiving medical treatment for drug withdrawal, Defendants ignored their responsibility to ensure her wellbeing.  Without monitoring and/or treating her withdrawal symptoms, ELIZABETH gained access to illicit drugs within the prison and suffered an overdose while in Defendants' care, custody, and control.

3.     In light of the Defendants' extraordinary misconduct, Plaintiffs, JOHN FANTINO AND DEBBIE FANTINO, AS CO-ADMINISTRATORS OF THE ESTATE OF ELIZABETH L. FANTINO, bring this civil rights survival and wrongful death action pleading federal constitutional claims under 42 U.S.C. § 1983 and supplemental state-law claims.  The Co-Administrators now seek on behalf of ELIZABETH L. FANTINO's estate and heirs, damages for the substantial pain and suffering, loss of enjoyment of life and financial losses caused by the Defendants' conduct as well as an award of punitive damages.

## II. JURISDICTION and VENUE

4.     This Court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4).

5.     This Complaint also includes pendant state law claims, over which this Honorable Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

6.     Venue is proper in the Western District of Pennsylvania pursuant to 28 U.S.C. § 1391 in that the Defendants reside in and/or conduct business within the judicial district and because a substantial part of the acts and/or omissions giving rise to this claim occurred within the territorial jurisdiction of this judicial district.

### III. WRONGFUL DEATH AND SURVIVAL ACTIONS

7.     Plaintiffs, JOHN FANTINO and DEBBIE FANTINO, AS CO-ADMINISTRATORS OF THE ESTATE OF ELIZABETH L. FANTINO, bring this action on behalf of ELIZABETH L. FANTINO's heirs under the Pennsylvania Wrongful Death Act, 42 Pa.C.S.A. § 8301.

8.     ELIZABETH L. FANTINO's heirs under the Wrongful Death Act are as follows:

  a.   Her husband, John Fantino, 292 Line Street, Ellwood City, PA 16117;

  b.   Her daughter, Jennifer White Kramer, 4176 South Ponderosa Drive, Gilbert, AZ 85297:

  c.   Her son, Jeremy Sodek, 11711 Collett Avenue, #2422, Riverside, CA 92505;

  d.   Her son, John Elmer Fantino, 4176 South Ponderosa Drive, Gilbert, AZ 85297: and

  e.   Her daughter, Joey Fantino, 4176 South Ponderosa Drive, Gilbert, AZ 85297.

9.     Plaintiffs also bring this action on behalf of the ESTATE OF ELIZABETH L. FANTINO under the Pennsylvania Survival Statute, 42 Pa.C.S.A. § 8302, under which all claims that ELIZABETH L. FANTINO would have been able to bring had she survived may be brought by her estate.

10.     ELIZABETH did not bring an action against the Defendants for damages for the injuries causing her death during her lifetime.

## IV. PARTIES

11.     Plaintiff, JOHN FANTINO, is the husband of the ELIZABETH and currently resides at 292 Line Street, Ellwood City, Lawrence County, Pennsylvania 16117.

12.     Plaintiff, DEBBIE FANTINO, is the sister-in-law of the ELIZABETH and currently resides at 958 Roup Avenue, Brackenridge, Allegheny County, Pennsylvania 15014.

13.     On January 22, 2020, JOHN FANTINO and DEBBIE FANTINO were appointed as Co-ADMINISTRATORS OF THE ESTATE OF ELIZABETH L. FANTINO by the Office of the Register of Wills of Butler County.  Plaintiffs, JOHN FANTINO and DEBBIE FANTINO, bring this action in their capacity as CO-ADMINISTRATORS OF THE ESTATE OF ELIZABETH L. FANTINO and for the benefit of ELIZABETH L. FANTINO's heirs.

14.     Defendant, WESTMORELAND COUNTY ("WESTMORELAND"), is a political subdivision of the Commonwealth of Pennsylvania designated as a Third-Class County duly organized and existing, under, and by virtue of the laws of the Commonwealth of Pennsylvania. WESTMORELAND's main office is located at 2 N Main Street, Greensburg, Pennsylvania 15601. WESTMORELAND owns, operates, and is responsible for overseeing the Westmoreland County Prison ("WCP").  The WCP is constitutionally responsible for the safe keeping and care of all inmates in its custody.  At all times and in all instances set forth in this Complaint, WCP was acting under the color of state law.

15.     Defendant, JOHN R. WALTON ("WALTON"), was, at all times relevant to this Complaint, employed by WCP as the Warden at WCP.  At all times relevant hereto, Defendant, WALTON, was responsible for the overall oversight, operation, and administration of WCP and

its staff and representatives.  Defendant, WALTON, was the final policymaker for Defendant, WESTMORELAND, with regard to all correctional matters at WCP.  WALTON is being sued in both his individual and supervisory capacity.  WALTON's address is 118 New Lane, Mount Pleasant, Westmoreland County, PA 15666-5531.  At all times and in all instances set forth in this Complaint, WALTON was acting under the color of state law.

16.     Defendant, LIEUTENANT RICHARD SIKORA ("SIKORA"), was, at all times relevant to this Complaint, a Correctional Officer employed by WCP as a Lieutenant at the WCP and was the responsible for ELIZABETH's care.  SIKORA was responsible for overseeing and ensuring that Corrections Officers perform routine inmate safety checks on all the inmates including, but not limited to, ELIZABETH, and to ensure that illicit drugs were not present within the confines of the WCP.  SIKORA's address is 901 Cribbs Street, Apartment B, Greensburg, Westmoreland County, PA 15601.  SIKORA is being sued in his individual and supervisory capacity.  At all times and in all instances set forth in this Complaint, SIKORA was acting under the color of state law.

17.     Defendant, KARLEIGH PALEK ("PALEK"), was, at all times relevant to this Complaint, a Correctional Officer employed by WPC as a Corrections Officer and was assigned to monitor cell K-1149A where ELIZABETH was housed while in the care and custody of WCP and to perform routine inmate safety checks.  PALEK's address is 209 Richmond Street, Loyalhanna, Westmoreland County, PA 15661-9720.  At all times and in all instances set forth in this Complaint, PALEK was acting under the color of state law.

18.     Defendant, CHEYENNE FISHER ("FISHER"), was, at all times relevant to this complaint, a Correctional Officer employed by WPC as a Corrections Officer and was assigned to monitor cell K-1149A where ELIZABETH was housed while in the care and custody of WCP and

to perform routine inmate safety checks.  FISHER's address is 213 Meadowview Drive, Latrobe, Westmoreland County, PA 15650-5145.  At all times and in all instances set forth in this Complaint, FISHER was acting under the color of state law.

19.     Defendant, WEXFORD HEALTH SOURCES, INC. ("WEXFORD"), is a for-profit Florida Corporation with a principal place of business located at 425 Holiday Drive, Foster Plaza Two, Pittsburgh, Pennsylvania 15220.

20.     Defendant, WEXFORD, advertises itself as "the nation's leading innovative correctional health care company" which "provides clients with experienced management and technologically advanced services, combined with programs that control costs while ensuring quality" and that "[f]or the past two decades, Wexford Health has consistently delivered proven staffing expertise and a full range of medical, behavioral health, ... and quality management services."

21.     Defendant, WEXFORD, is an entity that regularly practices correctional health care and holds itself out as expert in the medical issues presented in prison populations, and as such is aware of the need to properly train and supervise its employees.

22.     Defendant, WCP, contracted with Defendant, WEXFORD, to assume the responsibility to provide comprehensive health services, including but not limited to, medical staffing and services to inmates at WCP.

23.     DR. THOMAS LEHMAN ("Dr. LEHMAN"), Corporate Medical Director, Utilization Management & Clinical Services Chairman, Wexford Health Medical Advisory Committee had Supervisory Authority over all clinical staff and was the final policymaker for WEXFORD regarding all medical matters for prisoners at WCP.  Dr. LEHMAN was responsible

for promulgation, review, and enforcement of all policies, customs, and practices of the Medical Unit at WCP.

24.     Dr. LEHMAN is a replacement for JANE ROE 1, identified in the original complaint at an employee of WEXFORD responsible for providing necessary medical care and treatment to inmates at WCP including, but not limited to, ELIZABETH.

25.     Defendant, AUBREY KISTNER ("KISTNER"), was at all times relevant hereto an employee of WEXFORD, employed as a Certified Nurse Assistant ("CNA") and assigned to worked at WCP.   KISTNER was responsible for performing the Medical Evaluation/Initial Screening of ELIZABETH and/or COWS (Clinical Opiate Withdrawal Scale) Assessments of inmates at WCP including, but not limited to, ELIZABETH.

26.     CNA KISTNER is a replacement for JANE ROE 2, identified in the original complaint at an employee of WEXFORD responsible for performing a medical evaluation/screening of ELIZABETH and/or COWS (Clinical Opiate Withdrawal Scale) Assessments of inmates at WCP including, but not limited to, ELIZABETH.

27.     JANE ROE(S) 1-3 are fictitious names intended to identify one or more individuals who were, at all times relevant to this Complaint employed by Defendant, WEXFORD, and/or Defendant, WCP, responsible for performing a medical evaluation/screening of ELIZABETH and/or COWS (Clinical Opiate Withdrawal Scale) Assessment and providing necessary medical treatment of inmates at WCP including, but not limited to, ELIZABETH.

28.     At all times relevant to this Complaint, the conduct of the employees and/or agents of WEXFORD including, but not limited to, Dr. LEHMAN, KISTNER, and JANE ROE(S) 1-3 were so inextricably intertwined with the actions and purposes of Defendant, WESTMORELAND,

and Defendant, WCP, as to render them employee and/or agent state actors for the purposes of the conduct set forth in this Complaint.

29.    Defendant, WEXFORD, is vicariously liable for the acts of its employees, agents, and/or servants including, but not limited to, Dr. LEHMAN, CNA KISTNER, AND JANE ROE(S) 1-3.

30.    At all times relevant hereto, Defendant, WEXFORD, had also contracted to provide comprehensive health services, including but not limited to, medical staffing and services for Butler County Prison ("BCP").

31.    At all times relevant to this Complaint, all Defendants acted in concert and are jointly and severally responsible for the harms caused to ELIZABETH.

## V. FACTUAL ALLEGATIONS

### CORRECTIONAL PROFESSIONALS' KNOWLEDGE OF THE SERIOUS RISKS OF OPIOID (HEROIN) DETOXIFICATION, THE NEED FOR SCREENING OF NEW INMATES, AND THE IMPORTANCE OF CONTINUITY OF CARE

32.    It is not uncommon, and well known to prison officials, that newly incarcerated individuals experience substance withdrawal at the time of entry into prison, when their access to their drug of choice is abruptly stopped.

33.    In 2013, an average of 94 inmates addicted to drugs or alcohol were committed to the WPC every month.  The WPC's monthly average rose to 117 in 2014 and jumped to 147 in 2015.

34.    As far back as 2015, inmates were supposed to be screened by Defendant, WCP's medical staff when they arrived.  Depending on the level of the inmate's addiction and the stage of withdrawal, treatment could range from medication while the prisoner stays in the general

population to hospitalization under the watch of sheriff's deputies.  In addition, some inmates stay in a medical unit in the jail to be monitored.

35.     At one point in 2016, Defendant, WALTON, indicated that more than seventy percent (70 %) of incoming inmates required treatment for alcohol or drug abuse, with most addicted to opiates such as heroin.

36.     A 2016 study published in the journal *Substance Abuse and Rehabilitation* estimated that between 24 and 36 percent of opioid-dependent adults' cycle in and out of jails each year, creating a cycle between drug addiction and incarceration.

37.     The Bureau of Justice Statistics, part of the U.S. Department of Justice, estimated in a 2017 report that two-thirds of offenders held in state prisons and local jails had substance abuse problems, yet only a quarter of that group received adequate drug treatment.

38.     WALTON was aware, as late as February 2019, that more than eighty percent (80 %) of new inmates lodged at WCP were addicted to drugs or alcohol, with more than half (1/2) addicted to opioids.[1]

39.     Responding to the record number of addicted inmates, Tim Phillips, Director of Westmoreland County's Drug Overdose Task Force stated, "[o]nce we get them into the (justice) system, at least we can give them more assistance for their issues."  *Id*.

40.     According to WALTON, most detoxing inmates at WCP receive some medication to assist with their sickness for withdrawal symptoms.

41.     Inmates at WCP in need of detoxification services are supposed to be identified when they arrive at the jail.  Some are permitted to deal with their withdrawal symptoms in their cells while others are transferred to the jail's medical unit.

---

[1] Rich Cholodofsky, 2019, "Westmoreland Inmates Reach Record Detox Level in February" *Tribune-Review*, March 18, 2019.

42.     WCP was Constitutionally required to provide necessary Inmate Health Care Services to the inmates housed at WCP, under the Eighth (8th) Amendment "cruel and unusual punishment standard" for convicted prisoners, and Fifth (5th) and Fourteenth (14th) Amendment under the "Due Process Clause" for pretrial detainees.

43.     At all times relevant hereto WCP was Accredited by the National Commission on Correctional Health Care ("NCCHC") with it most recent accreditation occurring on March 25, 2019.

44.     Rather than directly providing Inmate Health Care Services, WCP delegated its responsibilities and duties to WEXFORD by entering a contract dated March 30, 2017 ("AGREEMENT").

45.     In transferring its duties and responsibilities WCP did impose certain requirements regarding the care to be provided by WEXFORD including, but not limited to, the following requirements:

    a.    WEXFORD had to comply with the STANDARDS FOR HEALTH SERVICES IN JAILS established by the "NCCHC". AGREEMENT §§2.1 3.1.3, 4.4.1;

    b.    The policies and procedures of WEXFORD relating to medical care were to be established and implemented by WEXFORD. AGREEMENT §2.4;

    c.    WEXFORD had to be accredited by, and maintain its accreditation with, the NCCHC. AGREEMENT §§1.2E, 3.23.6;

    d.    The standards had to be in compliance with the Standards for Health Services in Jail, established by the NCCHC. AGREEMENT §§3.1.3, 4.4.1;

    e.    Medical screening examinations on incoming inmates had to be performed within twenty-four (24) hours of their admission to the WCP. AGREEMENT §3.2;

    f.    The medical screening examination had to include inquiry into behavior observations, including state of consciousness, mental

status, appearance, conduct, alcohol or drug history, and whether the inmate is under the influence of alcohol or drugs. AGREEMENT §3.2;

g.      WEXFORD was required to maintain complete and accurate records of care. AGREEMENT §1.2G;

h.      WEXFORD had to generate and maintain electronic medical records using CorEMR and an inmate's records were to accompany the inmate at all health encounters and a copy thereof forwarded to the appropriate facility in the event of a transfer. AGREEMENT §3.14; and

i.      WEXFORD was responsible for continuity of care and was responsible for communicating pertinent medical information for coordinating continuing care with other correctional facilities after release of inmates from WCP. AGREEMENT §3.21.

46.      The medical policies and procedures established and implemented by WEXFORD were subject to review and approval by WARDEN WALTON, AGREEMENT §2.4.

47.      WEXFORD was required to provide a Medical Director with overall responsibility for the medical services provided to inmates. AGREEMENT §4.2.

48.      Dr. LEHMAN was the Medical Director, with supervisory authority over all clinical staff, who authorized and approved WEXFORD's "Medical Guidelines" ("GUIDELINES") in effect at the time ELIZABETH was incarceration at WCP and who was the final policymaker for WEXFORD with regard to all medical matters at WCP.

49.      At all times relevant hereto, Defendant, WEXFORD, maintained its Certification from the "NCCHC".

50.      Implementation of effective detoxification in correctional facilities requires adequate training of both health care and custodial staff. *Center for Substance Abuse Treatment, Detoxification and Substance Abuse Treatment. Treatment Improvement Protocol (TIP) Series 45, DHHS Publication No. (SMA) 06-4131.* Rockville, MD; Substance Abuse and Mental Health Services Administration: 2006.

51.     Health personnel should be trained that detoxification involves appropriate assessment, stabilization of withdrawal symptoms, and then tapering of the medication used to treat the withdrawal."  "Guide to Developing and Revising Alcohol and Opioid Detoxification Protocols"

52.     According to the "Guide to Developing and Revising Alcohol and Opioid Detoxification Protocols" *Kevin Fiscella, MD, MPH*, published by NCCHC, September 2015, "[s]taff conducting intake screening should be trained to administer screening questions to assess for alcohol and drug use, frequency, quantity, duration of use, and last use, and, most importantly, to obtain any history of prior episodes of withdrawal syndromes." [citation omitted].

53.     That same article states, "[i]ntake screening and assessment of all inmates is critical to a correctional facilities ability to safely and humanely manage [] opioid withdrawal."

54.     Accordingly, the NCCHC recommends screening questions inquire into six (6) separate questions regarding drug use: (i) use; (ii) frequency; (iii) quantity; (iv) duration of use; (v) last use; and (vi) history of prior withdrawal.

55.     With respect to medical screening, WEXFORD's GUIDELINES[2] provide, in part, as follows:

---

[2] To date, Plaintiffs have not been provided with WEXFORD's Receiving Screening and/or Physical Assessment process established by Wexford Health's operational guidelines, referenced in the **Note** in Section **I. GUIDELINE**



56.     The GUIDELINES specifically instruct that the following question must be asked by medical personnel as part of the Intake Screening:  "Do you drink alcoholic beverages or **use street drugs**?  **If so, when was your last usage, and how much**?"  [Emphasis added].

57.     Question #9 presented in WEXFORD's GUIDELINES only addresses three (3) [(i) use; (ii) last use; and (iii) quantity] of the six (6) areas of inquiry recommended by NCCHC.

58.     WEXFORD's GUIDELINES state, "it is incumbent upon the staff to initiate withdrawal, detoxification protocols as soon as it identife[s] that the inmate has been actively using drugs"

59.     NCCHC's White Papers on "Managing Opiate Withdrawal: The WOWS Method" specifically states that a prisoner experiencing opioid withdrawal should undergo assessments for a minimum of five (5) days.

60.     WEXFORD's Heroin/Opiate Withdrawal GUIDELINES reflect that both 7 days of Clonidine[3] 0.1 mg p.o. t.i.d and Phenergran 25 mg p.o. t.i.d. p.r.n. are the appropriate Medical Protocol to treat an inmate going through heroin/opiate withdrawal.

61.     With respect to "Continuity of Care", the AGREEMENT provides:

> 3.21  Continuity of Care  WEXFORD shall be responsible for communicating pertinent treatment information to the inmates and for coordination of continuing care with human service agencies or other correctional facilities after release of inmates from the Westmoreland County Prison.

62.     Elsewhere, the AGREEMENT provides that each inmate's medical records "shall accompany the inmate at all health encounters, and a copy thereof will be forwarded to the appropriate facility in the event of a transfer.

63.     NCCHC White Paper on "Patient Safety" specifically mentions having "handoff"[4] policies in place since "handoffs" are high-risk events due to potential miscommunication.

## ELIZABETH FANTINO'S ARREST AND INCARCERATION AT THE BUTLER COUNTY PRISON

64.     Like millions of other Americans, ELIZABETH tragically suffered from opioid use disorder ("OUD") also known as substance use disorder ("SUD").

65.     Heroin is an opioid and was ELIZABETH's drug of choice.

66.     Opioid use disorder is a diagnosis based on the American Psychiatric Association DSM-5 and includes a desire to obtain and take opioids despite social and professional consequences.  Alexander M Dydyk et al., Opiod Use Disorder, StatPearls (Jun. 21, 2022), https://www.ncbi.nlm.nih.gov/books/NBK553166/.

---

[3] Clonidine belongs to a class of medicines known as antihypertensives. It is frequently prescribed to help with the symptoms of opioid withdrawal.
[4] Also known as "Continuity of Care".

67.     According to the "NCCHC" Position Statement, OUD is a chronic treatable illness, and is a protected disability under the Americans with Disability Act ("ADA").

68.     On September 12, 2019, ELIZABETH was the arrested and taken into custody by Cranberry Township Police Department based on two (2) separate Bench Warrants for Probation Violations outstanding against ELIZABETH: one (1) from Allegheny County related to Docket No.: CP-02-CR-0014023-2008; and one (1) from Westmoreland County related to Docket No.: CP-65-CR-0003013-2016.

69.     At that time, ELIZABETH was well known by the Cranberry Township Police Department for her utilization of illicit drugs.

70.     After initially detaining ELIZABETH at the Cranberry Township Police Department for an unknown period, the Cranberry Township Police Department transported ELIZABETH to the Butler County Prison ("BCP").

71.     BCP's records indicate that ELIZABETH was committed into their facility on September 12, 2019, at approximately 8:50 pm.

72.     BCP also had a contractual agreement with WEXFORD transferring its duty and responsibility to provide Inmate Health Care Services to WEXFORD.

73.     Upon information and belief, WEXFORD's Receiving Screening and/or Physical Assessment process, established by Wexford Health's operational guidelines, and its "Medical Guidelines", referenced in its AGREEMENT with WCP, were also implemented by WEXFORD when providing Inmate Health Care Services at BCP.

74.     Rebba Zedreck, an LPN employed by Defendant WEXFORD, performed a medical evaluation of ELIZABETH wherein she noted under the heading "Current Problems" SUBSTANCE ABUSE.

75.    The "Medical History and Screening" form completed by WEXFORD, while ELIZABETH was incarcerated at BCP, contains the following questions and answers:

| 28 | Do you use street drugs, prescription pain meds, prescription anxiety meds, suboxone, or methadone daily? | ● Yes<br>No | |
|---|---|---|---|
| 29 | Type?<br>How Often?<br>Last Time? | Heroin last used yesterday, typically every day | |
| 30 | Have you had withdrawal problems when you stopped taking drugs? | ● Yes<br>No | |
| 32 | Are you currently detoxing or will you detox? | ☐ Yes<br>☑ No | |
| 33 | If yes, from what substance?<br>***These responses create CIWA/COWS Obs tasks for each nursing shift. | ☐ Alcohol<br>☐ Benzodiazepines / Anxiety Meds<br>☑ Heroin / Opiates / Pain Pills / Suboxone / Methadone<br>☐ Other | |

76.    Based on her response to the screening questions employed by WEXFORD's employee, an LPN at BCP, ELIZABETH underwent multiple COWS (Clinical Opiate Withdrawal Scale)[5] Assessments from September 13, 2019, at 9:27 a.m. through September 15, 2019, at 8:57 a.m. to monitor her condition.  During those assessments, ELIZABETH continuously exhibited "Mild" signs of withdrawal, scoring between a low of 4 and high of 9, on the COWS Assessment.

77.    On September 14, 2019, while incarcerated at BCP, in accordance with WEXFORD guidelines, Dr. Richard Gibbs, an employee of Defendant WEXFORD, prescribed several doses of Clonidine[6] 1 mg, for ELIZABETH.[7]

78.    While incarcerated at BCP, Dr. Gibbs also prescribed Ibuprofen 600 mg[8] for muscle aches; Phenergan[9] Ampule 25 mg for vomiting; Dicyclomine[10] 20 mg for abdominal cramping;

---

[5] NCCHC's White Papers on "Managing Opiate Withdrawal: The WOWS Method" specifically states that a prisoner experiencing opioid withdrawal should undergo assessments for a minimum of five (5) days.
[6] Clonidine belongs to a class of medicines known as antihypertensives. It is frequently prescribed to help with the symptoms of opioid withdrawal.
[7] WEXFORD's Westmoreland County Nursing Treatment Protocols dictates that Clonidine 0.1 mg p.o. t.i.d. should be given for seven (7) days.
[8] WEXFORD's Westmoreland County Nursing Treatment Protocols dictate prescribing Robaxin 750 mg p.o. t.i.d. for seven (7) days.
[9] WEXFORD's Westmoreland County Nursing Treatment Protocols dictate Phenergan 25 mg p.o. t.i.d. for seven (7) days.
[10] WEXFORD's Westmoreland County Nursing Treatment Protocols dictates Bentyl 20 mg p.o. t.i.d. for seven (7) days.

and Pink Bismuth for diarrhea for ELIZABETH, all which medications were to treat symptoms[11]

consistent with a person suffering from opioid withdrawal.

79.    The following Chart Note appears in ELIZABETH's medical records from BCP on

September 14, 2019, at 1:35 am, as charted by Defendant WEXFORD's employee:

> Inmate did not show up on task list to assess, however, called to B pod at
> 0110 [1:10 am] for inmate "unable to breathe".  Found inmate to breathing
> short, exaggerated breathes.  Inmate was able to give her medical history in
> complete uninterrupted sentences, which does not include Asthma.  She was
> clammy on her forehead and face, but otherwise a negative assessment.  She
> admitted to hx of anxiety/panic attacks[12] and **also detoxing from heroin**.
> [Emphasis added].  See COWS assessment for this time.

80.    The COWS Assessments provided at BCP were all performed by either an RN or

LPNs

81.    While incarcerated at BCP, ELIZABETH provided the following consent to

WEXFORD:

> I also authorize the transfer of my medical records or copies of said records to any facility to which I am referred
> for treatment or to any other correctional facility to which I am transferred.

82.    Accordingly, ELIZABETH consented to the transfer of her medical records to any

other correctional facility, such as WCP, upon her transfer.

83.    On September 15, 2019, at 6:06 pm, Westmoreland County picked up

ELIZABETH and transferred her care and custody to the WCP.

## ELIZABETH FANTINO'S INCARCERATION AND DEATH
## AT THE WESTMORELAND COUNTY PRISON

84.    ELIZABETH was booked into WCP at 7:40 pm.

---

[11] Under WEXFORD's Westmoreland County Nursing Treatment Protocols, abdominal cramping and diarrhea are identified as symptoms of an inmate suffering from heroin/opioid withdrawal.
[12] Anxiety is also a symptom of an inmate suffering from heroin/opioid withdrawal according to WEXFORD's Westmoreland County Nursing Treatment Protocols

85.     At   8:07   pm   ELIZABETH   underwent   an   Intake   Screening   performed   by WEXFORD CNA[13] KISTNER.

86.     The screening form used by WEXFORD at WCP is different than the form used by WEXFORD at BCP.

87.     The WCP Intake screening form inquired of ELIZABETH as follows:



88.     This   screening   question   and   form   are   deficient   in   that   it   fails   to   ask   screening questions inquiring into the six (6) specific areas regarding drug use recommended by the NCCHC: (i) use; (ii) frequency; (iii) quantity; (iv) duration of use; (v) last use; and (vi) history of prior withdrawal.

89.     In   addition,   the   screening   question   used   by   WEXFORD   at   WCP   fails   to   comply with   the   requirements   of   WEXFORD's   own   GUIDELINES   which   specifically   states   inquiry should be made into the use of "**street drugs**" as set forth below:

9.   Do you drink alcoholic beverages or use street drugs?  If so, when was your last usage, and how much?

90.     WEXFORD   GUIDELINES   specifically   caution   that   inmates   "claims   of   drug use/abuse may be exaggerated and/or diminished by the patient."

---

[13] A CNA (Certified Nursing Assistant) has less training and provides a lower level of care than an LPN (Licensed Practical Nurse), which is the level of training for the WEXFORD employees who were performing the medical screenings at BCP.  In its Request for Proposals soliciting bids to provide Inmate Health Care Services, WCP states that screening exams must be performed by qualified health care personnel.  The AGREEMENT states that "WEXFORD shall provide one (1) Certified Medical Assistant (CMA) CMA may be substituted for a Certified Nursing Assistant (CNA) or emergency Medical Technicians (EMT) * * * to conduct medical screenings during the booking process for inmates upon their arrival at the Westmoreland County Prison. Consequently, WEXFORD was able to designate CNA trained employees as the workers performing intake screening to save money and presumably increase its profit since CNAs are paid at a lower rate than LPNs.

91.     The records indicate that it only took CNA KISTNER one (1) minute to complete the entire Intake Screen Form and then one minute later she completed the Suicide Prevention Screening Guideline:

| Receiving Screen | 09/15/2019 2007 | View |
|---|---|---|
| Suicide Prevention Screening Guidelines | 09/15/2019 2008 | View |

92.     During that one (1) minute, CNA KISTNER also took ELIZABETH's vital signs:

**Vital Signs**

Viewing 1-1 of 1 Flow Record

| User | Record Date | Pos | BP Sys | BP Dia | Pulse | Resp. | Temp. | Weight | Height | BMI | S$_p$O$_2$ | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Kistner, CNA, Aubrey L | 09/15/2019 2007 | Sitting | 120 | 80 | 65 | 20 | 98.0 °F | 130 lbs | 5ft 6in | 21.00 | 97.0% | |

93.     During the Intake Screening, ELIZABETH identified that she suffered from Hepatitis C.

94.     Hepatitis C is found in 70-90% of illicit drug users.  (*Managing Hepatitis C in Users of Illicit Drugs*, PubMed Central: PMC3690289, NIHMSID: NIHMS23440, PMID 23801897).

95.     CNA KISTNER did not consider that a history of Hepatitis C was indicative of a possible history of opiate drug use and/or ask any follow up questions to obtain more information.

96.     Despite CNA KISTNER's report of having performed a thorough Intake Screening of ELIZABETH in one (1) minute, CNA KISTNER did not perform a thorough, proper, and competent Intake Screening of ELIZABETH and did not conduct an evaluation for important signs or symptoms of withdrawal or prior drug use as she was required to do.

97.     The receiving screen was approved by CNA KISTNER's superior on September 17, 2019, at 8:14 am, the day after ELIZABETH died of a drug overdose.

| Receiving Screen | Last saved on 09/15/2019 2007 | 09/15/2019 2007 | ✓Approved 09/17/2019 0814 |
|---|---|---|---|
| Suicide Prevention Screening Guidelines | Last saved on 09/15/2019 2008 | 09/15/2019 2008 | N/A |

98.     Despite ELIZABETH being a transfer inmate from BCP, there is no indication in ELIZABETH's medical records at WCP that CNA KISTNER ever received, reviewed, or requested, a copy of ELIZABETH medical records including, but not limited to, her Intake Screening, from BCP to perform a proper and complete Intake Screening and ensure "Continuity of Care" for this inmate transfer.

99.     CNA KISTNER knew, or should have known if properly trained, about the need to obtain prior medical records of a transfer inmate to ensure "Continuity of Care".

100.    WEXFORD utilized CorEMR, electronic medical records at both BCP and WCP.

101.    Since ELIZABETH, had signed an authorization/release for WEXFORD to permit the transfer of her medical records[14], CNA KISTNER had access through CorEMR to review ELIZABETH's records from her time at BCP when performing her intake screening.

102.    ELIZABETH's medical records contained in, and accessible on, CorEMR document that ELIZABETH had a significant prior history of opioid use, was experiencing withdrawal symptoms, was being monitored under COWS Protocol, and was being medically managed by another doctor at WEXFORD for her opioid detoxification.

103.    Had CNA KISTNER obtained ELIZABETH prior medical records she would have known that ELIZABETH (i) was an everyday heroin user until her arrest on 9/12/19; (ii) that she had last used heroin on 9/11/19; (iii) that she had a history of withdrawal problems when she stopped taking drugs; (iv) that she was in COWS protocol for two (2) days prior to her transfer to WCP; (v) that she was being medically managed by Dr. Gibbs, a co-employee at WEXFORD, with Clonidine, Phenergan, Dicyclomine, Ibuprofen, and Pink Bismuth; and (vi) at 1:35 am on 9/14/19, the day before she was transferred to WCP, she suffered a panic/anxiety attack.

---

[14] In addition to the Authorization/Release signed at BCP, ELIZABETH also signed a separate Authorization/Release during the intake process at WCP.

104. Had CNA KISTNER obtained ELIZABETH's prior medical records, ELIZABETH would have remained in COWS Protocol and received regular assessments.

105. Had CNA KISTNER obtained ELIZABETH's prior medical records, ELIZABETH would have continued under the medical management of the WEXFORD Doctor responsible for treating inmates at WCP.

106. Instead of following the policies, procedure, and protocol that exited, or should have existed, after the one (1) minute Initial Screening, CNA KISTNER medically cleared ELIZABETH to enter the general population without requiring any further follow up or monitoring:

| 3406-2019 | Receiving Screen | Medically cleared for general population "If no note in text why and complete appropriate advisement" | Yes | Kistner, CNA, Aubrey | 09-15-2019 8:07 pm |
|---|---|---|---|---|---|

107. ELIZABETH was placed in cell K-1149 at 8:45 pm, which cell did not have any video cameras to record activities inside cell K-1149. Most of the other cells at WCP, in the same unit, were equipped with video which was used to monitor inmate activities.

108. Upon information and belief, inmates housed in the medical unit at WCP are to be checked on by prison correctional personnel every fifteen (15) minutes.

109. According to WCP's Inmate Activities Visitors & Events Log, ELIZABETH was taken to Medical at 8:50 pm.



110. ELIZABETH remained in medical and was returned to her cell eleven (11) minutes later at 9:01 pm.



111.   It is presently unknown why ELIZABETH was taken to the Medical Unit forty-three (43) minutes after CNA KISTNER had cleared her for entry into the general population at WCP.  However, upon information and belief, ELIZABETH was returned to the Medical Unit due to medical complaints.

112.   At least one other inmate recalls hearing screams of pain and/or someone in distress coming from the area of cell K-1149 prior to ELIZABETH being found dead in her cell.

113.   At 10:10 am on September 16, 2019, ELIZABETH was taken from her cell to another area within WCP, for her arraignment, and then placed back in her cell at 10:41 am.

114.   At 1:54 pm FISHER and PALEK performed a security check and body count of Housing Units K & L.

115.   At 2:21 pm FISHER performed a security check.

116.   At 2:43 pm FISHER and PALEK performed a security check

117.   Around 3:00 pm ELIZABETH reported to her cellmate that she had been throwing up blood.

118.   At 4:03 pm FISHER performed another Security Check.

119.   No other security checks are documented in WCP's Inmate Activities Visitors & Events Log between 4:03 pm and 4:40 pm.

120.   None of the security check entries makes any notation regarding the Corrections Officers' observations of ELIZABETH.

121.   None of the security check entries indicates that the Corrections Officers' got close enough to ELIZABETH to conduct direct observations and ensure inmate breathing.

122.   From the security check entries, it cannot be determined if ELIZABETH was sleeping in her bunk, unconscious, or actively moving about within cell K-1149.

123.  At 4:40 pm PALEK entered Cell K-1149 to announce dinner.  While ELIZABETH's cellmate responded, but ELIZABETH did not respond.

124.  After receiving no response from ELIZABETH after a second inquiry about dinner, FISHER took her pen and ran it under the side of ELIZABETH 's foot to elicit a response.

125.  ELIZABETH remained motionless, laying on her stomach.  When FISCHER realized that ELIZABETH was not breathing, she called a Code Blue (Medical Emergency Alarm).

126.  Prior to EMS' arrival, ELIZABETH was relocated from her bed to a supine position on the floor, CPR was performed by employees of Defendant, WEXFORD, and 4 mg of intranasal Naloxone was administered.

127.  Naloxone is a medication that rapidly reverses an opioid overdose.  Naloxone is known to quickly restore normal breathing to a person if their breathing has slowed or stopped because of an opioid overdose.

128.  By administering Naloxone, Defendants, WESTMORELAND, WCP, WALTON, and WEXFORD, have acknowledged that they immediately suspected a drug overdose upon finding ELIZABETH unconscious in her cell.

129.  Moreover, by administering Naloxone, Defendants, WESTMORELAND, WCP, WALTON, and WEXFORD, have acknowledged that, if given in a timely manner, it could have reversed the effects of a drug overdose and saved ELIZABETH's life.

130.  Upon arrival on the scene at 4:57 p.m. the EMS paramedic found ELIZABETH unresponsive, pulseless, apneic[15], and cold to the touch in a warm environment.

131.  At 5:35 pm the Westmoreland County Coroner arrived on scene and officially pronounced ELIZABETH dead.

---

[15] Apneic refers to a cessation of breathing.

132.     The Westmoreland County Coroner requested that an autopsy be performed by Dr. Cyril H. Wecht and Pathology Associates.

133.     Dr. Wecht determined that ELIZABETH died "due to **ACUTE** combined drug toxicity – Fentanyl, Zoloft, Amphetamine, and Methamphetamine." [Emphasis added].  There was no evidence of recent physical violence or trauma.  The remainder of Dr. Wecht's examination was unremarkable.

134.     Neither Fentanyl, Zoloft, Amphetamine, nor Methamphetamine were medications prescribed by Defendant WEXFORD while ELIZABETH was under their care while either as an inmate at either BCP or WCP.

135.     At the time of her incarceration at WCP, ELIZABETH underwent a full body x-ray scan which confirmed that she did not have any contraband in her possession at the time she was booked into WCP.

136.     ELIZABETH also underwent a strip search to confirm that she did not have any contraband in her possession at the time she was booked into WCP.

137.     The combination of drugs found in ELIZABETH, and which caused her accidental overdose, were provided to ELIZABETH while she was an inmate at WCP.

138.     Had ELIZABETH remained in COWS Protocol and been receiving proper medical management of her withdrawal symptoms, she would not have sought contraband to feed her craving as evidenced by her prior conduct while an inmate at BCP, when she was receiving proper detoxification treatment.

## VI. LEGAL STANDARD

139.    If ELIZABETH is considered a convicted prisoner, based on her prior guilty pleas for retail theft and resulting probationary sentences, she is entitled to protection under the Eighth Amendment against the infliction of cruel and unusual punishment.

140.    Among the guarantees associated with Eighth Amendment protection is the right to "'humane conditions of confinement.'"

141.    The conditions-of-confinement protection includes an affirmative duty on the government's part to "'take reasonable measures to guarantee the safety'" of those in its custody.

142.    Because inmates "must rely on prison authorities to treat [their] medical needs," the government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

143.    The Third Circuit has explained that "[t]o state a claim for damages against a prison official for failure to protect from inmate violence, an inmate must plead facts that show (1) he was incarcerated under conditions posing a substantial risk of serious harm, (2) the official was deliberately indifferent to that substantial risk to his health and safety, and (3) the official's deliberate indifference caused him harm."

144.    "'[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain ... proscribed by the Eighth Amendment.'" *Tate v. Wiggins*, 805 F. App'x 159, 162 (3d Cir. 2020) (*quoting Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)).

145.    Alternatively, if while an inmate at WCP, ELIZABETH, having been charged with violating her probation, but not having been convicted of those recent offenses[16] she would be

---

[16] Tragically, at the video hearing conducted on September 16, 2019, the Westmoreland County Common Pleas Judge Timothy Krieger had vacated the Westmoreland County Bench Warrant, ordered that ELIZABETH be released

classified as a pre-trial detainee and guaranteed the right, under the Due Process Clause of the Fourteenth Amendment, to be free of punishment without due process of law.

146.     The Fourteenth Amendment offers both procedural and substantive protections to citizens by ensuring that states shall not "deprive any person of life, liberty, or property, without due process of law."

147.     The Due Process Clause of the Fourteenth Amendment provides the same right to medical care for pretrial detainees as the Eighth Amendment requires for convicted prisoners. *Colburn v. Upper Darby Twp.*, 838 F.2d 663, 668 (3d Cir. 1988).

148.     To succeed on a claim under *Section* 1983 for deliberate indifference to a serious medical need, a plaintiff must show: "[1] a serious medical need, and [2] acts or omissions by prison officials that indicate deliberate indifference to that need." *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (*citing Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999)).

149.     In *Wichterman v. City of Philadelphia*, 16-cv-5796, 2019 WL 3216609, at *9 (Jul. 17, 2019 E.D. Pa.) the Court found a causal nexus between the Defendant's failure to train officers in recognizing and responding to an overdose and the plaintiff's overdose because appropriate training would have allowed the officer to recognize the signs of an overdose in plaintiff and seek help.

150.     Under the Supreme Court case of *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), a municipal actor may be liable for actions of its employees or agents if the policy or custom is the motivating force behind a constitutional violation.  *Sanford v. Stiles*, 456 F.3d 298, 314 (3rd Cir. 2006).

---

forthwith, and scheduled ELIZABETH for a Revocation Hearing for a future date.  Accordingly, had that Order been processed more expeditiously, ELIZABETH should have been released from WCP.

151.    The policy or custom may be established "(1) by showing that a decision maker possessing final authority to establish municipal policy with respect to the action issued an official statement of policy, or (2) by demonstrating a custom exists when, though not authorized by law, the practices of state officials [are] so permanent and well settled that they operate as law." *Monell*, 436 U.S. at 690.

152.    Supervisory state officials are prohibited from enacting or maintaining unconstitutional polices, practices or customs with deliberate indifference to the consequences.

153.    Medical contractors may be subject to liability under *Monell* when they maintain policies that result in the denial of adequate medical care to prisoners.  *See Green v. Wexford Health Sources, Inc.*, 2016 WL 7239891 (E.D. Pa. December 14, 2016).

154.    Prior to ELIZABETH's incarceration and death, both WCP and WEXFORD were on notice of and had a history of deliberate indifference to inmates' medical care as evidenced by the cases of *Judith Ciszek, Administrator of the Estate of Gary L. DuBois v. Westmoreland County*, et als, 2:18-cv-01693-MRH (W.D. Pa. 2018); *Estate of Corey L. Kardos v. Westmoreland County, et als*, 2:09-cv-1093 (W.D. Pa. 2009) and *Barto v. Westmoreland County, et als*, 2:09-cv-00966-DSC (W.D. Pa. 2009).

## SPECIAL RELATIONSHIP EXCEPTION

155.    "[A] special relationship exists when "the State takes a person into custody and holds [them] there against [their] will." *Morrow v. Balaski*, 719 F.3d 160, 167 (3rd Cir. 2013) (*quoting DeShaney v. Winnebago County Dep't of Soc. Svs.*, 489 U.S. 189, 199-200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989)).

156.    ELIZABETH occupied a special relationship with Defendants, WESTMORELAND and WCP, due to the nature of her incarceration.

157.    By taking ELIZABETH into custody and holding her against her will, the state actors assumed responsibility for her safety and general well-being.

158.    Accordingly, Defendants, WESTMORELAND and WCP, had a duty to protect ELIZABETH from harm while she was in their custody, care, and control.

159.    Despite occupying said special relationship, Defendants failed to protect ELIZABETH from obtaining and using Fentanyl, Zoloft, Amphetamines, and Methamphetamines while within the confines of the WCP.

## VII. CLAIMS FOR RELIEF

### COUNT 1
### VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
### Failure to Protect

160.    The preceding paragraphs are incorporated herein by reference as if fully set forth herein.

161.    In taking ELIZABETH into their custody, Defendants assumed responsibility for the safety of ELIZABETH.

162.    The Due Process Clause to the Fourteenth Amendment prohibits state officials from engaging in conduct that renders an individual more vulnerable to harm.

163.    Defendants, WESTMORELAND, WALTON, SIKORA, PALEK, and FISHER, placed ELIZABETH in a dangerous situation and/or acted in willful disregard for her safety.

164.    Defendants, WESTMORELAND, WALTON, SIKORA, PALEK, and FISHER, knew that various illegal and illicit drugs, including but not limited to Fentanyl, Zoloft, Amphetamines, and Methamphetamines were being smuggled in WCP and being used by inmates at WCP.

165.    Defendants, WESTMORELAND, WALTON, SIKORA, PALEK, and FISHER, knew of the risks and harms associated with inmates using illegal and illicit drugs.

166.    Defendants, WESTMORELAND, WALTON, SIKORA, PALEK, and FISHER, knew that the use of illicit drugs was an ongoing problem in the facility and that anti overdoes drugs, such a Naloxone, had been used often due to prior inmates overdosing while in their custody.

167.    Defendants, WESTMORELAND, WALTON, SIKORA, PALEK, and FISHER, failed to monitor activities within the WCP to prevent the drug smuggling, and the use, of illicit drugs by inmates within the confines of the prison.

168.    Defendants, by failing to take appropriate action, Defendants, WESTMORELAND, WALTON, SIKORA, PALEK, and FISHER, permitted illegal drugs, including but not limited to Fentanyl, Zoloft, Amphetamines, and Methamphetamines, to be sold and used in WCP and thereby facilitated the use of illegal and dangerous drugs.

169.    Defendants, WESTMORELAND, WALTON, SIKORA, PALEK, and FISHER, ignored their knowledge and did not act to prevent the introduction, spread, and usage of illegal drugs, such as Fentanyl, Zoloft, Amphetamines, and Methamphetamines, within the confines of the prison.

170.    Defendants, WESTMORELAND, WALTON, SIKORA, PALEK, and FISHER's actions of tacitly permitting illegal drugs to be brought in and used inside created an atmosphere that made ELIZABETH more vulnerable to suffering from a possible overdose or otherwise having an adverse reaction to the consumption of an illicit drug and which constituted a deliberate indifference to a serious risk of harm.

171.    Defendants, WESTMORELAND, WALTON, SIKORA, PALEK, and FISHER, allowed ELIZABETH to obtain Fentanyl, Zoloft, Amphetamines, and Methamphetamines while in their custody, care, and control.

172.    Defendants, WESTMORELAND, WALTON, and SIKORA, through its employees and agents including, but not limited to Defendants, PALEK and FISHER, created the opportunity for harm to ELIZABETH which would otherwise not have existed while in confinement.

173.    Allowing ELIZABETH to obtain and use Fentanyl, Zoloft, Amphetamines, and Methamphetamines, while an inmate at WCP, directly led to ELIZABETH experiencing an accidental, and fatal, overdose.

174.    As a direct result of the deliberate indifference of Defendants, ELIZABETH suffered unnecessary pain and an untimely death.

175.    Defendants' actions and inactions constitute a violation of ELIZABETH's rights under 42 U.S.C. § 1983.

**COUNT II**
**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983**
**Failure to Perform Proper Safety Checks and Provide Proper Medical Care**

176.    The preceding paragraphs are incorporated herein by reference as if fully set forth herein.

177.    Defendants, WESTMORELAND and WALTON, had a constitutional obligation to formulate, adopt, and enforce adequate rules and policies to ensure quality care for the patients incarcerated at WCP.

178.    Defendant, WESTMORELAND, was accredited by NCCHC and knew of the requirements for policies and procedures to (i) properly assess incoming inmate's medical

condition, (ii) continuity of care and the need to obtain the medical records of an inmate transferring in from another correctional facility, (iii) perform a proper medical screening including obtaining a history of prior street drug use (iv) to perform routine COWS Assessments of inmates with a history of recent drug use and/or showing active signs of withdrawal, (v) medically manage an inmate's withdrawal from heroin, and (vi) timely administer Naloxone to save an overdosing inmate's life.

179. Defendants, WESTMORELAND and WALTON, either failed to have policies in place to perform the above referenced medical care; failed to properly train the doctors and staff to working within its facility to perform those duties or were aware that the doctors and staff were failing to perform the required duties and failed to correct such action.

180. Defendants, WESTMORELAND and WALTON's failure to act appropriately constitutes deliberate indifference to ELIZABETH.

181. Defendants, WESTMORELAND, WALTON, and SIKORA, failed to train Defendants, PALEK and FISHER, in performing proper safety checks to ensure that inmates are not suffering from a serious medical condition.

182. When the EMS workers arrived in ELIZABETH's cell, her body was cold to the touch in a warm environment.

183. The fact that ELIZABETH'S body was cold to touch in a warm environment suggests that she had been dead for several hours.[17]

---

[17] The body's temperature drops 1.5 degrees for each hour after death. Typically, a body will remain flaccid (soft) and warm for approximately the first three (3) hours after death.

184.    The Westmorland County Coroner documented that ELIZABETH was cold to touch in all regions and that incomplete rigor mortis was present in ELIZABETH's hands and feet.[18]

185.    According to WCP's Inmate Activities Visitors & Events Log, FISHER performed a security check at 2:21 pm

186.    At 2:43 pm FISHER and PALEK performed a security check

187.    According to the Westmoreland County Coroner's Case Summary Report ELIZABETH reported to her cellmate around 3:00 pm that she had been throwing up blood.

188.    At 4:03 pm FISHER performed another Security Check.

189.    At 4:40 pm, when FISHER entered Cell-1149 after both inmates failed to respond to her verbal inquiry, she found ELIZABETH dead.

190.    The timeline of events documented by FISHER and PALEK in WCP's Inmate Activities Visitors & Events Log are inconsistent with forensic evidence and therefore believed to be inaccurate and/or false.

191.    Based on the state of ELIZABETH's body when she was discovered deceased at 4:40 pm, she would have had to have dies at least two (2) hours earlier, if not longer.

192.    Accordingly, the security checks performed at 2:21 pm and thereafter had to have either been improperly performed or falsified.

193.    The security checks performed prior to 2:21 by FISHER and PALEK were likewise either improperly performed or falsified.

---

[18] Rigor mortis appears approximately 2 hours after death in the muscles of the face and progresses to the limbs over the next few hours.  NIH National Library of Medicine, "*Methods of Estimation of Time Since Death*", Rijen Shrestha, Tanuj Kanchan, Kewal Krishan

194.    Had FISHER and PALEK performed proper security checks on the date of September 16, 2019, they would have discovered that ELIZABETH had obtained illicit drugs and/or that she was suffering the adverse effects of an overdose.

195.    Defendants, WESTMORELAND, WALTON, and SIKORA, failed to train Defendants, PALEK and FISHER, in recognizing the signs and symptoms of a possible overdose and how to properly respond to an overdose.

196.    Had Defendants, PALEK and FISHER, received appropriate training it would have allowed those officers to recognize the signs of an overdose in ELIZABETH and to seek help.

197.    Had Defendants checked on ELIZABETH earlier they would have learned of her condition and ELIZABETH could have received lifesaving medical treatment.

198.    As a direct result of the deliberate indifference of Defendants, ELIZABETH suffered unnecessary pain and an untimely death.

199.    Defendants' actions and inactions constituted a violation under 42 U.S.C. § 1983.

**COUNT III**
**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983**
**Monell Claim: Insufficient Policies & Procedures and Failure to Train & Supervise**

200.    The preceding paragraphs are incorporated herein by reference as if fully set forth herein.

201.    Reasonably trained correctional policymakers and officers and reasonably trained practitioners of correctional healthcare were aware of the increased abuse of heroin and other opiate-based controlled substances.

202.    Reasonably trained correctional policymakers and officers and reasonably trained practitioners of correctional healthcare were uniquely attuned to patterns of heroin and opiate

abuse due to the disproportionately high number of heroin and opiate abusers typically present in a correctional population.

203.   Reasonably trained correctional policymakers and officers and reasonably trained practitioners of correctional healthcare were, likewise, aware that large numbers of inmates admitted to the correctional facilities suffer from suffer from detoxification at the time of their admission due to their being cut off from their drug of choice.

204.   Reasonably trained correctional policymakers and officers and reasonably trained practitioners of correctional healthcare know that Intake Screening and Initial Assessment of inmates is critical to a correctional facility's ability to manage opioid withdrawal safely and humanely.

205.   Reasonably trained correctional policymakers and officers and reasonably trained practitioners of correctional healthcare know to look for signs and symptoms of withdrawal and the medical history of an inmate which might be a red flag indicative of drug use.

206.   Reasonably trained correctional policymakers and officers and reasonably trained practitioners of correctional healthcare know and understand that detoxification for heroin users is not usually dangerous when it takes place with proper monitoring and treatment.  However, without proper monitoring and treatment detoxification is known to have several harmful and potentially fatal medical consequences, and, as such, inmates experiencing detoxification have serious medical needs.

207.   Such dangerous medical consequences are particularly likely to be present in persons who are heavy users of heroin.

208.     Monitoring of an individual experiencing heroin withdrawal includes performing assessments multiple times per day of vital signs, including pulse, respiration, blood temperature and body temperature.

209.     Such monitoring must also include evaluation multiple times per day of symptoms which are consistent with serious health consequences of detoxification such as vomiting, diarrhea, cramping, anxiety, sweating and restlessness.

210.     Such monitoring also includes medical management and following protocols regarding the length of time an inmate receives medication and how the inmate responds to that medication.

211.     Reasonably trained correctional policymakers and officers and reasonably trained practitioners of correctional healthcare know and understand that proper medical records promote continuity of care and protects the health and safety of the inmate population.

212.     Reasonably trained correctional policymakers and officers and reasonably trained practitioners of correctional healthcare know and understand the importance of "Continuity of Care" and having "hand-off" protocol in place to ensure that a copy of the inmate's medical records is forwarded to the appropriate facility in the event an inmate is transferred to another medical or correctional facility.

213.     Reasonably trained correctional policymakers and officers have policies and procedures to ensure that Corrections Officers have eyes-on an inmate and personally view the inmate.

214.     Reasonably trained correctional policymakers and officers have policies and procedures to ensure that Corrections Officers get close enough to the inmate to conduct direct visual observations of the inmate to see skin and ensure the inmate is breathing.

215.    Reasonably trained correctional policymakers and officers have policies and procedures to ensure that Corrections Officers log the time of the check and to accurately record their observations at the time of the check.

216.    Reasonably trained correctional policymakers and officers have policies and procedures to ensure that Corrections Officers provide proper, thorough, safety checks and not cursory walk byes.

217.    Reasonably trained correctional policymakers and officers have policies and procedures to ensure that Corrections Officers audit safety check logs to ensure that the policies and procedures are being properly followed, that the safety checks are being performed properly and that the information in the logs is accurate.

218.    Reasonably trained correctional policymakers and officers have policies and procedures to address Contraband Control to prevent inmates from obtaining and using illicit drugs within the confines of the prison.

219.    Dr. LEHMAN, on behalf of WEXFORD, was responsible for developing, implementing and enforcing WEXFORD's policies and procedure related to inmate healthcare.

220.    Defendant, WALTON, had the ultimate authority to approve or disapprove of any such policies and was the senior most person at WCP was the decisionmaker related to inmate healthcare.

221.    Dr. LEHMAN and WALTON knew that the Intake Screening Questionnaire being used by WEXFORD employees including, but not limited to Defendant, KISTNER, did not inquire into the six (6) areas of inquiry recommended by NCCHC.

222.    Dr. LEHMAN and WALTON knew that the Intake Screening Questionnaire being used by WEXFORD employees including, but not limited to Defendant, KISTNER, did not specifically ask about "street drugs" as required by WEXFORD's own MEDICAL GUIDELINES.

223.    By failing to specifically ask about street drugs, a heroin addict, such as ELIZABETH, would appropriately respond to the question asked by stating "No" believing the question was limited to prescription drugs and because no specific inquiry was made into illicit or "street drugs".

224.    When ELIZABETH was specifically asked about the use of street drugs three (3) days earlier, by WEXFORD's LPN Rebba Zedreck, utilizing WEXFORD's BCP screening intake form, ELIZABETH appropriately responded, "Yes":



setting the COWS protocol into motion at BCP

225.    The failure to follow the NCCHC recommended questions and WEXFORD's own MEDICAL GUIDELINES resulted in CNA KISTNER obtaining incomplete and/or misleading information during the Intake Screening Procedure.

226.    Had the correct questions been asked of ELIZABETH, WEXFORD and WCP would have known that ELIZABETH (i) was an everyday heroin user until her arrest on 9/12/19; (ii) that she had last used heroin on 9/11/19; and (iii) that she had a history of withdrawal problems when she stopped taking drugs.

227.    Had the above information been obtained, WEXFORD would have implemented COWS protocol and medically managed ELIZABETH's withdrawal like WEXFORD employees did at BCP prior to her transfer to WCP.

228.    WEXFORD was required under the AGREEMENT to establish a Quality Improvement Program.   Had Dr. LEHMAN or anyone else in a supervisory position at WEXFORD reviewed the Intake Screening Questionnaire being utilized at WCP they would have known that the Questionnaire was deficient.

229.    The AGREEMENT between WESTMORELAND and WEXFORD specifically addresses "Continuity of Care", however the Agreement only mentions "Continuity of Care" as it relates to the release of inmates.

230.    The AGREEMENT fails to address "Continuity of Care" related to inmates being transferred into WCP.

231.    "Continuity of Care" is equally important for inmates being transferred into WCP as it is for inmates being transferred out of WCP.

232.    The AGREEMENT fails to address this significant medical issue.

233.    The Policies and Procedure developed by Dr. LEHMAN fail to address this significant medical issue.

234.    Alternatively, if it argued that it was tacitly understood by the parties that "Continuity of Care" was equally important for inmates being transferred into WCP although not specifically mentioned in the AGREEMENT, in that case, Dr. LEHMAN, WESTMORELAND, and WALTON failed to train and/or enforce its policy of obtaining inmates records when they were being transferring into WCP.

235.    Had Defendant, KISTNER, been trained to follow such a procedure she would have requested and made sure that she obtained ELIZABETH's medical records since she knew she had been transferred in from BCP.

236.    Had CNA KISTNER obtained ELIZABETH's prior medical records she would have known that ELIZABETH (i) was an everyday heroin user until her arrest on 9/12/19; (ii) that she had last used heroin on 9/11/19; (iii) that she had a history of withdrawal problems when she stopped taking drugs; (iv) that she was in COWS protocol for two (2) days prior to her transfer to WCP; (v) that she was being medically managed by Dr. Gibbs, a co-employee at WEXFORD, with Clonidine, Phenergan, Dicyclomine, Ibuprofen, and Pink Bismuth; and (vi) at 1:35 am on 9/14/19, the day before she was transferred to WCP, she suffered a panic/anxiety attack.

237.    Had CNA KISTNER obtained ELIZABETH's prior medical records, ELIZABETH would have remained in COWS Protocol and received regular assessments.

238.    Had CNA KISTNER obtained ELIZABETH's prior medical records, ELIZABETH would have continued under the medical management of the WEXFORD Doctor responsible for treating inmates at WCP.

239.    Had ELIZABETH continued to receive medical management of her withdrawal she would not have had cravings for illicit drugs.

240.    If ELIZABETH did not have a craving for illicit drugs she never would have accidentally overdosed on a combination of Fentanyl, Zoloft, Amphetamines, and Methamphetamines while in their custody, care, and control of WCP.

241.    Reasonably trained correctional health practitioners and Corrections Officers are particularly attuned to patterns of heroin and opioid abuse due to the disproportionately high number of heroin and opioid abusers typically present in inmates incarcerated at Defendant, WCP.

242.    Reasonably trained correctional health practitioners and Corrections Officers are aware of the significant risk of overdose among heroin and opiate users.

243.    Although heroin and/or opioid overdose is a highly dangerous and potentially deadly emergency, there were in 2019 readily available and effective means of medical intervention to reverse the effects of overdose.

244.    In 2019, reasonably trained correctional health practitioners and Corrections Officers were aware of the available and effective means of medical intervention to reverse the effects of overdose.

245.    Additionally, reasonably trained correctional health practitioners and Corrections Supervisors, such as Defendants, WALTON and SIKORA, were aware of their responsibility to train and supervise correctional health practitioners and Corrections Officers to recognize the signs of drug withdrawal, drug overdose, and to intervene to reverse the effects of an overdose.

246.    Reasonably trained correctional health practitioners and Corrections Officers are aware that heroin and opioid users will seek out drugs, especially if they are experiencing signs and symptoms of withdrawal.

247.    Reasonably trained Corrections Officers know to look for evidence of smuggling illicit drugs into a prison and are trained how to respond to prevent the smuggling of illicit drugs into prison.

248.    Defendants, WCP and WALTON, maintained a policy that permitted illegal and illicit drugs to be smuggled into the WCP and used by inmates incarcerated at WCP.

249.    In the alternative, Defendants, WCP and WALTON, did not have a policy in place that prohibited and/or prevented drugs from being smuggled into WCP, had an ineffective policy to prohibit and/or prevent drugs from being smuggled into WCP, or had a policy that failed to properly train and supervise subordinates on how to detect and enforce any anti-smuggling policy to prevent any drugs that did enter the WCP from reaching other inmates.

250.    Defendants, WCP and WALTON, also did not have a policy in place that required routine inmate safety checks, or if such policy was in place, Defendants failed to enforce that policy and failed to properly train and supervise their subordinates on how to properly conduct inmate safety checks.

251.    Despite the knowledge of the above facts, Defendants, WCP, WALTON, and SIKORA, took no action to prevent ELIZABETH from obtaining Fentanyl, Zoloft, Amphetamines, and Methamphetamines, and from the consequences of an overdose from those drugs while in their care, custody, and control.

252.    Defendant, WCP's Safety Check policy was either ineffective or Defendants, FISHER and PALEK, were improperly trained and/or supervised.

253.    Inmate safety checks are intended to ensure that inmates are not involved in criminality, such as drug sales and usage, and to check on the safety of inmates.

254.    Proper inmate safety check policies and procedure require that Correction Officers actually get close enough to the inmate to conduct direct visual observations of inmates.

255.    Had Defendants, FISHER and PALEK, been properly trained and supervised, they would have intervened and prevented ELIZABETH from obtaining the combination of Fentanyl, Zoloft, Amphetamines, and Methamphetamines while in their custody, care, and control.

256.    Defendants, FISHER and PALEK, would have heard the screams of pain and/or someone in distress coming from the area of cell K-1149.

257.    Defendant, FISHER and PALEK, failed to properly investigate those screams.

258.    If they had, and/or performed proper safety checks, they would have discovered the distress that ELIZABETH was in and that she needed emergency medical assistance.

259.   If Defendant, FISHER and PALEK, had performed proper safety checks they would have known that ELIZABETH had been vomiting in her cell.

260.   The failure to respond to screams of pain and failure to perform proper safety checks is evidence of their deliberate indifference to ELIZABETH.

261.   Had Defendant, FISHER and PALEK, responded to the above events, they could have administered Narcane at a time where it would have made a difference in saving ELIZABETH's life.

262.   Finally, as set forth above, WCP failed to have policies, and/or failed to train its employees regarding the policies and procedures to address Contraband Control to prevent inmates from obtaining and using illicit drugs within the confines of the prison.

263.   Had that been done, ELIZABETH never would have obtained the Fentanyl, Zoloft, Amphetamines, and Methamphetamines while in their custody, care, and control.

264.   WESTMORELAND, WALTON, SIKORE, FISHER and PALEK all knew of the risks of illicit drugs inside a prison and failed to take appropriate action to prevent that from happening.

265.   Defendants, WESTMORELAND, WALTON, and SIKORA, are liable if they at least implicitly authorized, approved of, or knowingly acquiesced in the unconstitutional conduct of a subordinate.

266.   Defendants, WESTMORELAND and WALTON's, actions and inactions constituted a violation under 42 U.S.C. § 1983 and under the Fourteenth Amendment to the United States Constitution, and the conduct of the defendants' evidence deliberate indifference by failing to establish policies, practices, procedures, training, and supervision regarding the safety and

medical care of ELIZABETH, which caused ELIZABETH to suffer unnecessary pain and an untimely death.

**COUNT IV**
**Corporate Liability**

267.     The preceding paragraphs are incorporated herein by reference as if fully set forth herein.

268.     The Pennsylvania Supreme Court in *Thompson v. Nason Hospital*, 591 A.2d 703 (Pa. 1991), adopted the theory of corporate liability as a vehicle for patient recovery when a medical institution fails to provide adequate medical care to its patients.

269.     The Pennsylvania Supreme Court has identified four separate duties which, when their breach results in damages, will establish corporate liability:

> (1) A duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients …

270.     More recently, the Pennsylvania Supreme Court has extended the application of corporate medical liability from a hospital to all entities where a "resident-entity relationship exists such that the entity owes the resident a duty of care." *Scampone v. Highland Park Care Ctr., LLC*, 57 A.3d 582, 584 (Pa. 2012).

271.     Defendant, WEXFORD, had a duty and contractual obligation to provide a constitutionally acceptable level of medical care to the prisoners it served.

272.     Defendant, WEXFORD, had a duty and contractual obligation to formulate, adopt, and enforce adequate policies, practices and procedures including, but not limited to, ensuring continuity of care for inmates transferred in to WCP from other facilities, obtain medical records of an inmate being transferred in from other facilities, to review medical records and medical

screenings for inmates transferred in to WCP from other facilities; to provide proper medical screenings, ensure that inmates are properly evaluated for prior drug use, detect and recognize any signs or symptoms of prior drug use and/or opioid withdrawal, provide proper monitoring of inmates experiencing withdrawal, and render emergency treatment to inmates suffering from an overdose.

273.    Defendant, WEXFORD, either failed to have policies in place to perform the above referenced medical care; failed to properly train the doctors and staff assigned to work at WCP to perform those duties or was aware that the doctors and staff were failing to perform the required duties and failed to correct such action.

274.    Defendant, WEXFORD, failed to implement adequate policies or enforce existing policies to ensure the safety of ELIZABETH.

275.    Defendant, WEXFORD, also had a duty to oversee all persons who practiced medicine and/or otherwise provided medical care and services within the confines of WCP.

276.    Defendant, WEXFORD, failed to oversee the persons who practiced medicine and/or otherwise provided medical care and services within WCP, including, but not limited to, failing to (i) properly assess ELIZABETH's medical condition, (ii) ensure "Continuity of Care" by reviewing her prior medical records upon transfer, (iii) perform a proper medical screening, (iv) perform routine COWS Assessments, (v) medically manage ELIZABETH's withdrawal from heroin, and (vi) timely administer Naloxone to save ELIZABETH's life.

277.    Defendant, WEXFORD, failed to provide the requisite experienced and trained medical staff that would recognize and appreciate a serious medical condition and treat same appropriately.

278.     As a direct result of the negligence, breach of duty, and deliberate indifference of Defendant, WEXFORD, ELIZABETH suffered unnecessary pain and an untimely death.

279.     Defendant, WEXFORD's actions and inactions constituted a violation of Pennsylvania's Corporate Liability law, which caused ELIZABETH to suffer unnecessary pain and an untimely death.

**COUNT V**
**State Law Negligence Claims**

280.     The preceding paragraphs are incorporated herein by reference as if fully set forth herein.

281.     Defendants, WEXFORD, Dr. LEHMAN, CNA KISTNER, and other employees and/or agents of WEXFORD owed a duty of care to inmates at WCP including, but not limited to, ELIZABETH.

282.     Defendants, WEXFORD and CNA KISTNER, and other employees and/or agents of WEXFORD were negligent, including but not limited to, the following:

   a.     Failing to obtain ELIZABETH's medical records from her time at BCP to ensure continuity of care:

   b.     Failing to review ELIZABETH's medical records from her time at BCP;

   c.     Failing to perform a proper Intake Screening/Assessment;

   d.     Failing to recognize the signs and symptoms of past opioid use and/or withdrawal;

   e.     Failing to perform routine COWS Assessments to monitor ELIZABETH's withdrawal symptoms;

   f.     Failing to follow NCCHC's recommended protocol for the amount of time to continue performing COWS Assessments;

   g.     Failing to provide medication to assist ELIZABETH with her withdrawal symptoms;

h.     Failing to follow its own guidelines as to the period of time certain medications prescribed to assist with medical management of withdrawal should be continued;

i.     Failing to possess and/or exercise adequate medical skills, knowledge, experience, and techniques for the proper treatment of ELIZABETH;

j.     Failing to properly manage ELIZABETH's opioid withdrawal; and

k.     Failing to timely administer Naloxone to reverse the effects of a drug overdose.

283.    Defendant, WEXFORD, is vicariously liable for the acts of its employees, agents and/or servants, including but not limited to Defendant, CNA KISTNER.

284.    The medical care, diagnosis, treatment, and services provided by Defendant, CNA KISTNER, and other employees, agents and/or servants of Defendant, WEXFORD, was performed in an indifferent and careless manner, and not in accordance with professional standards.

285.    As a direct result of the negligent conduct of Defendants, WEXFORD and JANE ROE(S) 1-3, ELIZABETH suffered unnecessary pain and an untimely death.

286.    The actions of Defendants, WEXFORD and CNA KISTNER, and other employees and/or agents of WEXFORD constituted a violation of Pennsylvania's negligence law, which caused ELIZABETH to suffer unnecessary pain and an untimely death.

## REQUESTED RELIEF

WHEREFORE, Plaintiffs, JOHN FANTINO and DEBBIE FANTINO, CO-ADMINISTRATORS OF THE ESTATE OF ELIZABETH L. FANTINO, demand judgment in their favor and against Defendants, WCP, WALTON, SIKORA, PALEK, FISHER, WEXFORD, and CNA KISTNER as follows:

a.     Compensatory damages;

b.    Punitive damages

c.    Reasonable attorney's fees plus interest and costs as the law may allow;

d.    All damages recoverable under 42 U.S.C. § 1983;

e.    All damages recoverable under Pennsylvania Wrongful Death Act, 42 Pa.C.S.A. § 8301;

f.    All damages recoverable under Pennsylvania Survival Statute, 42 Pa.C.S.A. § 8302; and

g.    Such other and further relief as the Court may deem just and proper.

## <u>JURY DEMAND</u>

Plaintiffs hereby demand a trial by jury of all triable issues as permitted under *Fed.R.Civ.P.* 38(b).

Respectfully submitted,

Attorneys for Plaintiffs:

By:<u>/s/ Douglas J. Olcott</u>
Douglas J. Olcott, Esquire
PA I.D. No. 204851
dolcott@edgarsnyder.com
Edgar Snyder & Associates, LLC
US Steel Tower, 10th Floor
600 Grant Street
Pittsburgh, PA 15219-2705
(412) 394-1000

**PROOF OF SERVICE**

This is to certify that a true and correct copy of the foregoing document has been served upon all counsel of record via the courts Electronic Mail/CM/ECF filing system at the following address:

David J. MacMain, Esquire
Brian C. Conley, Esquire
433 W. Market Street, Suite 200
West Chester, PA  19382
*Attorney for Defendants, County of Westmoreland, Westmoreland County Prison,*
*John Walton, Lt. Richard Sikora, Karleigh Palek and Cheyanne Fisher*
*dmacmain@macmainlaw.com*
*bconley@macmainlaw.com*

Jeffrey J. Wetzel, Esquire
Christopher J. Watson, Esquire
Two PPG Place, Suite 400
Pittsburgh, PA 15222
*Attorneys for Defendant Wexford Health Sources, Inc.*
*jwetzel@dmclaw.com*
*cwatson@dmclaw.com*

Edgar Snyder & Associates
/s/ Douglas J. Olcott
Douglas J. Olcott, Esquire

Date:  April 20, 2023